# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 16-CV-00609-MEH

SHAWN LOVETT,

     Plaintiff,

v.

ANTHONY MARTINEZ, in his individual capacity,
SHANNON PROUD, in his individual capacity,
DR. RICHARD HODGE, in his individual and official capacities,
TORRI ARTHUR-CAIN, in her individual capacity,
WARDEN TRAVIS TRANI, in his individual and official capacities,
CAPTAIN RONALD ORTIZ, in his individual and official capacities,
DEPUTY DIRECTOR KELLIE WASKO, in her individual and official capacities.

     Defendants.

---

## AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Shawn Lovett, by and through his attorney Sarah Schielke of The Life & Liberty Law Office, respectfully alleges for his *Amended Complaint and Jury Demand* as follows:

## I.  NATURE OF CLAIMS

1. This case is about multiple assaults upon the Plaintiff (and the systemic and escalating threats and harassment which led to the assault), which Centennial Correctional Facility Warden Travis Trani has stated is "the worst case of excessive force he has seen in his career."

1

2. This is an action for damages and other relief against Defendants Anthony Martinez and Shannon Proud for their deliberate indifference to Plaintiff Lovett's clearly established constitutional rights under the Eighth Amendment to the U.S. Constitution as demonstrated by their malicious assault and infliction of pain on Plaintiff in violation of that Amendment.

3. This is also an action for damages and other relief against Defendant Dr. Richard Hodge and Defendant nurse Torri Arthur-Cain for their willful failure to provide critical medical treatment to Plaintiff following Defendant Martinez's and Proud's assaults; a failure which revealed Defendant Hodge's and Arthur-Cain's deliberate indifference to Plaintiff Lovett's clearly established constitutional right to receive critical medical care and treatment while in custody as required by the Eighth Amendment to the U.S. Constitution.

4. This is also an action for injunctive relief against Deputy Executive Director Defendant Kellie Wasko for her and the Colorado Department of Corrections' continuing refusal to provide Plaintiff with the critical medical care that his untreated head, brain and vision injuries require, and in so doing, exacerbating Plaintiff's underlying injuries and causing Plaintiff to endure additional needless pain and suffering.

5. This is also an action for damages and other relief against Defendants Warden Travis Trani and Captain Ronald Ortiz for the failure to train, investigate, and supervise correctional officers including but not limited to Defendants Proud and Martinez in,

and their promulgation of unconstitutional policies and practices regarding: appropriate methods for use of force, pressure point control tactics, use of universal restraints and spit masks, and for the failure to supervise and put an end to systematic and ongoing verbal and racial harassment of prison inmates like Plaintiff Lovett committed by correctional officers Defendant Shannon Proud and others which led to this assault. Defendant Trani and Ortiz's deliberately indifferent policies and failures to train, supervise and investigate their employees at CCF were a driving force and cause of both the assaults upon, and deliberately inadequate medical care thereafter provided to, Plaintiff Lovett, causing him further suffering, trauma, and injury.

## II. INTRODUCTION

6. On September 10, 2014, correctional officer Defendants Martinez and Proud conspired and successfully executed a plan to harm Plaintiff, an inmate whom Defendant Proud wanted to retaliate against and greatly disliked. In the Mental Health intake unit at Centennial Correctional Facility ("CCF"), they first cuffed Plaintiff Lovett's hands behind his back and applied leg cuffs to his feet. Then, while Plaintiff Lovett was restrained and helpless, Defendant Martinez grabbed the chain connecting the cuffs on Plaintiff's ankles and yanked it towards the ceiling, lifting Plaintiff off of his feet, flipping him upside down, and causing his head to be slammed into the concrete floor. Defendant Proud stood back and purposely did nothing to protect Plaintiff's head or to stop or slow Plaintiff's fall. Plaintiff was knocked unconscious and began bleeding all over the floor. While Plaintiff was restrained, unconscious and

bleeding, Defendant Martinez and Proud jumped on top of his lifeless body and began applying severe pain-inducing maneuvers to his back, spine, and neck for over two minutes. Once Plaintiff was taken to medical, Defendants Martinez and Proud falsified their reports regarding the incident. Defendants Martinez and Proud are currently facing criminal charges for their assault on Plaintiff, as well as for their subsequent cover-up. Defendant Martinez was fired. Defendant Proud was not.

7. When Plaintiff was brought to medical, because they disliked Plaintiff, Defendants Arthur-Cain and Dr. Hodge falsified medical records regarding Plaintiff's need for medical care and to conceal the true extent of his injuries, and refused him any meaningful medical treatment at all for over three hours. During this time, Plaintiff was left in universal restraints and had a spit mask pulled over his head, causing his profuse ongoing bleeding to well up into his eye and face. Defendant Dr. Hodge ignored the clear and obvious medical need for Plaintiff to be immediately hospitalized, evaluated and treated for brain trauma and injury despite personally observing multiple lacerations and an enormous, swelling contusion on Plaintiff's head and despite being informed that impact of this event had caused Plaintiff to lose consciousness. He did not send Plaintiff out for even a single X-Ray. Defendant Dr. Hodge's failure to provide Plaintiff with this critical medical care and treatment exacerbated Plaintiff's physical and psychological injuries.

8. Plaintiff Mr. Lovett brings this action for monetary damages, an injunctive order, and other relief against Defendants for violating his rights under the Eighth and Fourteenth Amendments to the Constitution of the United States.

## III.    JURISDICTION AND VENUE

9. This action arises under the Constitution and laws of the United States and the State of Colorado, and is brought pursuant to Title 42 U.S.C. § 1983.

10. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 and 1343(a)(3).

11. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

12. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

13. Plaintiff has exhausted all available administrative remedies in accordance with § 13-17.5-102.3(1), C.R.S.

## IV. PARTIES

14. Plaintiff, Shawn Eugene Lovett, is a citizen of the United States and was at all times relevant hereto a resident of and domiciled in the State of Colorado as an inmate at Centennial Correctional Facility. In December 2014, Plaintiff was transferred to San Carlos Correctional Facility where he remains incarcerated presently. Both Centennial Correctional Facility and San Carlos Correctional Facility are run, staffed and operated by the Colorado Department of Corrections.

15. At all times relevant to the subject matter of this litigation, upon information and belief, Defendant Anthony Martinez was a citizen of the United States and a resident of the State of Colorado and was acting under color of state law in his capacity as a correctional officer employed with the Colorado Department of Corrections. Defendant Martinez is sued in his individual capacity.

16. At all time relevant to the subject matter of this litigation, upon information and belief, Defendant Shannon Proud was a citizen of the United States and a resident of the State of Colorado and was acting under color of state law in his capacity as a correctional officer employed with the Colorado Department of Corrections. Defendant Proud is sued in his individual capacity.

17. At all times relevant to the subject matter of this litigation, upon information and belief, Defendant Dr. Richard Hodge was a citizen of the United States and resident of Colorado. At all relevant times, Defendant Hodge was acting under color of state law in his capacity as a medical doctor employed with the Colorado Department of Corrections. Defendant Hodge is sued in his individual and official capacities.

18. At all times relevant to the subject matter of this litigation, upon information and belief, Defendant Torri Arthur-Cain was a citizen of the United States and resident of Colorado. At all relevant times, Defendant Arthur-Cain was acting under color of state law in her capacity as a nurse employed with the Colorado Department of Corrections at Centennial Correctional facility. Defendant Arthur-Cain is sued in her individual capacity.

19. At all times relevant to the subject matter of this litigation, upon information and belief, Defendant Travis Trani was a citizen of the United States and resident of Colorado. At all relevant times, Defendant Trani was the Warden of Centennial Correctional Facility, employed by the Colorado Department of Corrections, acting under color of state law, with supervisory authority over Defendants Ortiz, Martinez and Proud.

20. At all times relevant to the subject matter of this litigation, upon information and belief, Defendant Ronald Ortiz was a citizen of the United States and resident of Colorado. At all relevant times, Defendant Ortiz was a Captain at Centennial Correctional Facility, employed by the Colorado Department of Corrections, acting under color of state law, with supervisory authority over Defendants Martinez and Proud.

21. At all times relevant to the subject matter of this litigation, upon information and belief, Defendant Kellie Wasko was a citizen of the United States and resident of Colorado. At all relevant times, Defendant Wasko was acting under color of state law in her capacity as Deputy Executive Director, Director of Clinical and Correctional Services of the Colorado Department of Corrections. In this capacity, Defendant Wasko had executive oversight of all functions reporting to the clinical services division at DOC. Defendant Wasko oversees the delivery of medical and mental health services to Colorado prisoners.

# V. FACTUAL ALLEGATIONS

22. On the morning of September 10, 2014, Plaintiff, then an inmate at Centennial Correctional Facility, was preparing for escort back to his normal pod, waiting in a cell located in the Mental Health intake area of the facility. Plaintiff had been on mental health watch during the previous 24 hours, of his own accord. He had asked to be placed on mental health watch status because he was having personal difficulties and was extremely stressed by hearing that his brother might not be able to walk again after being in a car accident. However earlier that morning, Plaintiff and a mental health provider had agreed he was doing better and could be taken off of mental health watch status and returned to his pod.

23. At about 10:20 a.m., Defendants Proud and Martinez, correctional officers and partners, arrived at Mr. Lovett's cell in Mental Health intake, and informed him they would be escorting him back to his regular pod at the jail facility. Defendant Proud did not like Plaintiff Mr. Lovett, and had a documented history of harassing, cussing at, and threatening Mr. Lovett. Defendant Martinez, on the other hand, had never before met or interacted with Plaintiff.

24. Defendant Martinez was known to relish opportunities to use force on inmates, had been involved in an excessive number of use of force incidents, and on at least one occasion prior had thrown a chair against a wall in a tantrum upon finding out that a forced cell entry event he planned to participate in (which was expected to utilize use of force on an inmate) had been cancelled. Defendant Martinez had a reputation

within the Department of Corrections and at CCF as being a "snap cap"; that is, an officer who angers easily.

25. Defendants Trani and Ortiz were personally aware of Defendant Martinez's reputation and propensity for use of force incidents. Defendants Trani and Ortiz were also personally aware of Defendant Proud's long history of complaints and grievances for harassing, threatening and provoking mental health inmates (Plaintiff Proud specifically and in particular). Despite this knowledge, Defendant Ortiz (who also greatly disliked Plaintiff) tasked Martinez and Proud with Plaintiff's transport.

26. Plaintiff noticed when Defendant Proud and Martinez arrived at his cell that they both appeared to be smirking. Plaintiff immediately became worried that the Defendants were up to something, particularly because of his negative history with Defendant Proud.

27. Defendant Proud, along with fellow correctional officer Kevin Duty prior to this had regularly harassed and threatened Plaintiff, and Plaintiff (along with other inmates) had previously reported to Proud's supervisors (namely, Defendants Ortiz and Trani) that Proud and Duty frequently called Plaintiff (who is black) "monkey," and "boy." All those inmates to hear Proud and Duty's taunting and harassment directed at Plaintiff found the comments to be racial, discriminatory, threatening, and offensive, and intended to provoke, upset and cause Plaintiff to suffer emotional distress. *See* **Exhibit 1**, *Audio File of OIG Interview with Plaintiff Shawn Lovett* (9-26-14), 20:00- 22:00.

28. Defendant Proud had also on occasions prior to this tampered with Plaintiff's meals/snacks, and arbitrarily docked Plaintiff earned privileges. Plaintiff filed grievances about Defendant Proud's harassment and racial attacks which were ignored by Defendants Trani and Ortiz. Another inmate (not Plaintiff) filed a grievance about Defendant Proud and Duty's racist slurs directed at Plaintiff which also went ignored and uninvestigated.

29. Plaintiff's mother and members of his family made repeated efforts to contact the Department of Corrections and Warden Trani at CCF to complain about the provocation and racial harassment from Defendant Proud and officer Duty. This information was transmitted to Defendant Proud, who late one night in early September informed Plaintiff that he was going to pay for complaining about his harassment to the warden. Specifically, Defendant Proud informed Plaintiff that he was going to "beat [his] ass." *See* **Exhibit 1**, 17:00.

30. As a result of this history, seeing Defendants Martinez and Proud arrive at his cell to escort him on the morning of September 10, 2014, smirking at one another, placed Plaintiff in immediate fear for his safety. Accordingly, Plaintiff reminded Defendants Martinez and Proud of the fact that he was on "high security level" status which required three officers and someone with a camera to transport him anywhere within the facility. Plaintiff was in fact on high security level status requiring such form of documented transport. Plaintiff told Defendants he didn't want to come out until a third officer with a camera was present. Defendants told Plaintiff "too bad," that the

count in his normal pod was starting in just a couple minutes, and so if he wanted to go back to his pod, and not spend another night in isolation in the intake cell, he had to go with just the two of them right then. Feeling he had no choice, Plaintiff agreed to go.

31. Before going to Plaintiff's cell to escort him that morning, Defendants Martinez and Proud discussed Proud's history with, and dislike for, Plaintiff Lovett. Defendant Proud shared with Defendant Martinez his belief that Plaintiff was easy to provoke and would be an easy target to assault without consequence. Further, both Defendants Martinez and Proud were aware - like nearly every other experienced correctional officer at CCF - that the area in which they would be cuffing Plaintiff did not have meaningful video surveillance coverage. *See* **Exhibit 2**, *Interview with Sergeant Constance Crossman*, (10-8-2015), 3:00-4:53 ("[The incident] was up in the front of intake, where the computer is, and there's no cameras up there.").

32. As a result, Defendant Proud and Martinez's assault on Plaintiff was only captured by one video camera far away at the back of intake, which had to be enhanced to reveal what happened. *See* **Exhibit 3**, *Enhanced Video of Assault*. Their assault was also partially captured by a video camera inside one of the nearby observation cells. *See* **Exhibit 4**, *Enhanced Video of Assault – Observation Cell*. The following events described in ¶33-45 were captured on those videos.

33. Defendant Martinez first directed Plaintiff to put his hands behind his back and to face out backwards, putting just his hands through the tray slot of his cell so that his wrists

could first be handcuffed. Plaintiff was compliant with this directive and his arms were restrained in handcuffs behind his back.

34. Once Plaintiff's hands were restrained behind his back, Defendant Proud opened Plaintiff's cell door and Defendant Martinez directed him to walk backwards out of his cell and to stand, raising his feet behind him one at a time, so that his legs could also be cuffed and restrained. Plaintiff complied with this directive.

35. Defendant Martinez, standing slightly to Plaintiff's left, then bent down and began applying leg iron restraints to Plaintiff. Meanwhile, Defendant Proud stood to Plaintiff's right side by roughly 2-3 feet, verbally antagonizing and cussing at Plaintiff in an effort to provoke him into an act of noncompliance, while also staring at Martinez and Plaintiff as Martinez applied leg restraints. Defendant Proud was trained to have at least one hand on Plaintiff while Defendant Martinez applied leg restraints, to catch Plaintiff in case Plaintiff lost his balance or began to fall. He knew that Plaintiff naturally would not have been able to catch himself with his hands if he fell, since those were already cuffed behind his back. Defendant Proud deliberately did not put his hand on Plaintiff to provide this critical safety measure. (Later, he lied and told his supervisors he had his hand on Plaintiff.) Instead, Defendant Proud continued his efforts to verbally provoke Plaintiff into saying or doing something that could be used to falsely justify his and Defendant Martinez's planned assault on Plaintiff.

36. Defendant Martinez first applied the right leg restraint cuff to Plaintiff's right leg. Then Defendant Martinez moved to Plaintiff's left leg and applied the left restraint cuff to Plaintiff's left leg. Both leg cuffs were locked on Plaintiff.

37. Plaintiff can be observed on the video keeping his left foot up with the shoe bottom of his foot (Plaintiff was wearing shower sandals and white socks) clearly raised up toward the camera so that Defendant Martinez could apply the left leg cuff restraint. See **Figure 1**, below. Defendant Martinez then told Plaintiff he needed to double-lock the cuff and to keep his foot up. Plaintiff did so.

38. Defendant Proud, still standing to the side, was growing frustrated that his efforts to provoke Plaintiff into some observable form of noncompliance while Defendant Martinez applied restraints had been so far unsuccessful. Defendant Proud then told Plaintiff he was going to throw out Plaintiff's snack. Plaintiff cooly responded, "quit talking to me and take me back to my cell."

39. Right as Plaintiff finished making this statement to Defendant Proud, Defendant Martinez grabbed Plaintiff's leg restraints by the steel chain that ran between the two leg cuffs and with both hands violently pulled it towards the ceiling (see **Figure 2**, below). While holding the chain connecting Plaintiff's ankles, Defendant Martinez thrust all his weight and force upwards (going from a squatting to a standing position), causing the fully restrained and helpless Plaintiff to be lifted off his feet and have his head and face slammed into the concrete floor (see **Figure 3**, below).

Defendant Martinez's assault caused Plaintiff to be knocked unconscious. Plaintiff immediately began bleeding profusely from multiple head wounds.



**Figure 1**



**Figure 2**



**Figure 3**

40. As the Office for the Inspector General's ("OIG's") investigator Alex Wold described the incident: "During the time prior to being taken down Lovett's left foot clearly remains raised up and the white bottom of the left shoe can be seen. Then Martinez is seen grasping the restraints chains with both hands and in an explosive upward

jerkmotion, while pushing up his upper body with his own legs, he pulls the chain upward until it's shoulder high to his torso. This causes offender Lovett's legs to go out from under him, going behind him, sending him head first into the floor without any means to catch himself or break his fall to the ground due to the fact that his hands are behind his back secured in restraints. As officer Martinez reaches his full momentum upward, he is fully standing up, his hands are stretched above his head, and he tosses Lovett to the side. Martinez's right hand pulls free from the chain and can be seen flying off. The entire take down is a violently explosive movement on Officer Martinez's part and throughout the offender is helpless, unable to resist in any way."

41. Because harm to Plaintiff was the intended goal of their conspiracy, neither Defendant Martinez nor Defendant Proud made any effort to break Plaintiff's fall, to protect his head, or to interrupt the momentum of his face careening towards the cement floor.

42. Plaintiff was violently taken down by Defendant Martinez while defenseless, unable to protect or catch himself while being thrown to the floor. Defendant Martinez used Plaintiff's leg iron chain attached to his legs as a deadly weapon to pull Plaintiff off his feet and cause his head to slam into the cement floor. Martinez can be observed on both of the videos using both of his hands to yank Plaintiff's leg iron chain (and restrained legs) violently upwards and to his right, pulling Plaintiff completely off his feet.

43. Defendant Martinez used so much force when jerking Plaintiff's leg irons towards the ceiling <u>that the leg irons themselves broke</u>. The OIG investigators reviewing the incident found that the manner in which Defendants Martinez and Proud took Plaintiff out put Plaintiff at extraordinary risk of breaking his neck or being killed.

44. The moment that Plaintiff's head hit the ground, Defendants Martinez and Proud converged on him, continuing the assault. Both climbed onto his back and applied pain pressure tactics to his spine, legs, back, and neck for the sole purpose of causing him more pain. See **Figure 4**, below.



**Figure 4**

45. Plaintiff was at first rendered totally unconscious. His feet can be observed on the video twitching slightly due to his brain/head injury and the resulting concussion. While Plaintiff was unconscious and bleeding from his head onto the cement floor, and while Defendants Proud and Martinez both had their knees, hands and most of

their body weight pressed into Plaintiff's back, neck, and spine, Defendants began shouting at Plaintiff "Stop resisting, Lovett! Stop resisting!"

46. Sergeant Sandy Valentine was sitting in her office nearby but out of sight of Defendants Proud and Martinez. When she heard the commotion, she grabbed a handheld camcorder and began recording video. *See* **Exhibit 5**, *Valentine Post-Assault Handheld Video Recording*. When she arrived and asked what happened, Defendant Proud, without prompting from Defendant Martinez, immediately stated that Plaintiff "tried to kick him [Martinez] while he was putting his legs on." Sergeant Valentine then immediately joined Defendants Proud and Martinez in yelling at the unconscious Plaintiff to stop resisting, and stop fighting. Additional correctional officers soon arrived, and they also climbed onto the back of the unconscious Plaintiff while blood continued to pour out of his head and pool on the cement floor. See **Figure 5**, below.



**Figure 5**

47. For over two minutes, Defendants Proud and Martinez continued to apply pain-inducing pressure maneuvers to Plaintiff's back, neck, and spine while also pushing their body weight onto his back, neck and spine. Defendant Martinez applied a "mandibular angle" pressure point maneuver to Plaintiff on a sensitive nerve point behind Plaintiff's ear for over two minutes. The sole purpose of this "mandibular angle" maneuver is to induce severe pain. After the first few seconds of kneeling on top of Plaintiff's body and engaging in these maneuvers, Plaintiff regained marginal consciousness and began moaning from the pain. Defendants did not stop. Instead, Defendants stayed on top of Plaintiff's back while he moaned, continuing to yell at him to "stop resisting" and to "stop fighting." While they yelled at Plaintiff, he was incapable of meaningful response and not aggressively resistant towards any officers. Rather, and as OIG Investigator Wold found, any movements observed from Plaintiff on the video "appear to be spontaneous, reflex/reaction responses mainly in the form of twitching of the legs and hands caused by his injury, not intentional movement."

48. Plaintiff, still moaning in pain, then attempted to lift his head, utterly confused and terrified. Defendant Martinez responded to this first movement of Plaintiff's head by pushing Plaintiff's face directly back down into the pool of his own blood. *See* **Exhibit 5**, at 00:30.

49. Sergeant Valentine eventually noticed that Plaintiff was not resisting, and directed Defendants Proud and Martinez to get off of Plaintiff's back so he could receive medical attention. Defendants Proud and Martinez did not comply with this directive,

and instead both remained on top of him with their knees in his back and hands applying pain-inducing pressure maneuvers to his neck, continuing their assaults.

50. Sergeant Valentine directed Defendants Proud and Martinez three more times to get off of Plaintiff's back so that Plaintiff could receive medical attention. They ignored her. Finally, Defendants Proud and Martinez reluctantly climbed off of Plaintiff so that he could be rolled onto his back and receive medical attention. By the time they got off of him, Plaintiff had already lost a significant amount of blood.

51. Plaintiff Mr. Lovett sustained multiple lacerations to his head (requiring stitches), brain damage, vision and memory loss. He has no recollection of what happened after being told to keep his left leg up by Defendant Martinez and telling Defendant Proud not to talk to him. The next thing he remembers is waking up in the infirmary in a spit mask and universal restraints – terrified, in tremendous pain, and with his left eye and upper body soaked in his own blood.

52. Defendant Torri Arthur-Cain, a nurse on duty at this time, claimed that she injured her knee running respond to this incident. Defendants Ortiz directed the filing of charges against Plaintiff for this "assault" on the nurse, and ordered him held financially responsible for her medical treatment.

53. All staff and supervisors present (including Arthur-Cain) reported Plaintiff as responsible for nurse Arthur-Cain's injury, which she claimed required medical treatment. While she sought medical treatment, Defendants Proud and Martinez put the unconscious Plaintiff in universal restraints and a spit mask. The spit mask caused

Plaintiff's oozing blood to well up in his left eye and all over his face. Plaintiff was left in this condition for over two hours. After two hours, nurse Arthur-Cain herself was the one to provide Plaintiff's initial medical "treatment" which consisted of filling out a form (where she marked Plaintiff's pain as "zero" and falsely alleged that five minutes after the assault, Plaintiff's active bleeding was "minimal") and telling Defendant Dr. Richard Hodge that Plaintiff needed stitches.

54. Defendant Dr. Hodge had treated Plaintiff previously and did not like Plaintiff. With deliberate indifference to Plaintiff's obvious medical needs, Defendant Dr. Hodge delayed the provision of any medical care for Plaintiff for an additional hour for no reason except his dislike of Plaintiff, announcing to medical staff upon seeing Plaintiff's face to leave him there, untreated and in pain, as Defendant Hodge "had other things to do."

55. While waiting for Defendant Dr. Hodge to provide medical treatment of some kind for over three hours, the enormous contusion on Plaintiff's head continued to swell and bleed. He had two lacerations, one on his forehead and one over his left eye, which plainly required hospitalization for stitches, staples and associated basic medical assessment and treatment. Defendant Dr. Hodge eventually sewed 9 stitches over the wounds. The laceration on Plaintiff's forehead could not be stitched fully closed due to the amount of swelling in the area and ceaseless bleeding. The forehead laceration continued to bleed after being stitched closed and further soaked Plaintiff's face and clothing.

56. Dr. Richard Hodge was the medical professional at the CCF facility with the responsibility for providing Plaintiff's medical treatment. Also with deliberate indifference to Plaintiff's obvious medical needs, Defendant Dr. Hodge purposely elected not to conduct any concussion assessment of any kind on Plaintiff, which was a complete and utter derelict of his basic training as a medical professional. Despite observing and tending personally to Plaintiff's unmistakably grave head injuries, and despite being personally aware of the fact that Plaintiff had lost consciousness during the incident, Dr. Hodges did not refer Plaintiff out for a CT scan, X-Ray or MRI (or any kind of emergency care at all) to determine the full extent of his injuries requiring treatment. Instead, he falsely reported that Plaintiff's injuries were of "unknown etiology" and gave Plaintiff an ice pack. He did not provide Plaintiff with any pain medication. Plaintiff continued to suffer unnecessarily as a result of Dr. Hodge's deliberate indifference to his obvious medical needs.

57. After stitching Plaintiff's head wound shut, Defendant Proud strip-searched Plaintiff and then put him back into universal restraints and a spit mask and took him to an isolation cell, where Plaintiff of course – by virtue of the universal restraints on his hands and legs – was unable to apply the ice pack to his swelling head. Plaintiff was forced to remain in his blood-soaked clothing while in restraints in isolation for another hour. Plaintiff was in unnecessary and wanton pain this entire time.

58. Universal restraints and spit masks are, by written DOC policy, only to be used on noncompliant offenders as a means of gaining compliance, and they are never to be

used as means of punishment. Despite this written policy, Defendants Trani, Ortiz and Proud knowingly kept the compliant Plaintiff in universal restraints and a spit mask for roughly four hours after Defendant Proud and Martinez's assault. They did this solely to punish Plaintiff, and obviously not for purposes related to gaining compliance, as Plaintiff was at all times that day compliant with officer directives.

59. While Plaintiff sat restrained, suffering and bleeding in medical, Defendants Martinez and Proud were falsifying their reports regarding this incident as planned. Defendant Martinez wrote that Plaintiff "aggressively kicked back towards [Martinez] striking [his] right hand/wrist" which the videos revealed (and OIG Investigator Alex Wold found) to be plainly false. Defendant Martinez further wrote that he "gained control of Lovett [sic] left ankle, and placed him on the ground in an attempt to gain compliance" and that "[o]nce on the ground the offender continued to grab my arm/hands … and kick officer Proud." The videos revealed (and OIG Investigator Alex Wold found) these statements to also be false. Defendant Martinez obviously did not "place" Plaintiff on the ground, and Plaintiff clearly made no attempt to kick anybody.

60. Defendant Martinez also claimed an injury to his right hand as a result of the incident which was determined to be false. Worse, Defendant Martinez wrote an official CDOC CCF report falsely alleging he was assaulted by Plaintiff. These allegations caused Plaintiff to have disciplinary sanctions taken against him through DOC administrative actions (see ¶63, *infra*). Defendant Martinez did not seek or make a

workman's compensation claim or go to obtain medical attention for his alleged injury until he was told by Warden Travis Trani on September 11 that he was being placed on administrative leave as a result of his video review of the incident. OIG Investigator Alex Wold further found that Defendant Martinez's workman's compensation claim was a false claim as the injury he complained of (if it in fact existed) was caused by his own misconduct.

61. Defendant Proud also wrote a false report concerning the incident. Defendant Proud wrote that prior to Plaintiff having his head slammed into the concrete, Plaintiff's "body language was animated by jerking his head and cussing" and that "[o]nce on the ground offender Lovett was increasingly agitated and began to kick his legs." The videos and Investigator Wold's findings, ("The video reflects that the offender is being compliant with directives, there is very little movement of his head or upper body during the process of applying the restraints"), confirmed that neither of these assertions were true. Defendant Proud also failed to report Defendant Martinez's assault as an excessive use of force as required by § 18-8-803, C.R.S., and the CDOC Code of Conduct 1450-1.

62. Defendant Proud further falsely reported that "once offender Lovett was under control they rolled him to his side and sat him up until First Responders arrived." The video evidence clearly shows that this also did not happen, as Defendant officers Martinez and Proud were on top of Plaintiff Lovett's upper body and his upper legs holding him down and continuing to assault him for several minutes while he bled all over the

cement floor. It should be noted that First Responders had to stand around waiting for Defendants Proud and Martinez to finally comply with Sergeant Valentine's directives to get off of Plaintiff, before they could begin administering care.

63. Defendant Martinez's and Defendant Proud's false reports concerning this assault caused Plaintiff to have disciplinary sanctions taken against him by the Department of Corrections. He was charged with Making Threats, Advocating or Creating Facility Disruption, and Verbal Abuse as a result of Defendants' false reports and received, among other punishments, a sanction of losing 50 days good time. He was also held responsible for the cost of Defendant nurse Arthur-Cain's medical treatment.

64. Defendant Officer Anthony Martinez was put on leave pending investigation by the Office of Inspector General (OIG). During the OIG's investigation, Defendants Proud and Martinez were interviewed and confronted with the video of the incident. Both refused to change their reports after seeing the video and asserted that their false reports were still "accurate as written."

65. Prior to this assault on Plaintiff, Defendant Martinez had been involved in at least twelve use of force incidents and when interviewed, Defendant Martinez stated that he considered this incident, compared to the others, to be "moderate." *See* **Exhibit 6**, *OIG Interview with Martinez*, at 40:34.

66. Prior to this incident, Defendant Martinez had a reputation as being a "snap cap," that is, a corrections officer who has a short temper with offenders and is quick to react aggressively with offenders. Defendant Warden Trani was personally aware of

Martinez's reputation. *See* **Exhibit 7**, *OIG Interview with Warden Trani*, at 31:43. Lieutenant Tracey Miramontes was personally aware of Martinez's reputation. *See* **Exhibit 8**, *OIG Interview with Lieutenant Miramontes*, at 3:40. Defendant Ortiz was also aware of this reputation.

67. Defendant Martinez was fired from his position at the Department of Corrections. In Fremont County case number 15CR63, Defendant Martinez has been criminally charged with one count of Assault in the Second Degree pursuant to § 18-3-203(1)(b), C.R.S. (a class 4 felony), one count of Attempt to Influence a Public Servant pursuant to § 18-8-306, C.R.S. (a class 4 felony) and one count of Assault in the Third Degree pursuant to § 18-3-204(1)(a), C.R.S. (a class 1 misdemeanor). In Fremont County case number 15CR93, Defendant Proud has been criminally charged with one count of Accessory to Crime pursuant to § 18-8-105(1)(5), C.R.S. (a class 5 felony), one count of Attempt to Influence a Public Servant pursuant to § 18-8-306, C.R.S. (a class 4 felony), one count of First Degree Official Misconduct pursuant to § 18-8-404, C.R.S. (a class 2 misdemeanor), and one count of False Reporting pursuant to § 18-8-111(1)(c), C.R.S. (a class 3 misdemeanor). As of the date of this filing those cases remain pending.

68. Defendant Proud continues to work at the Department of Corrections. Defendant Warden Trani went as far as to issue a letter to Defendant Proud stating that no disciplinary action against him would be taken and that the warden's and the DOC's investigation into Defendant Proud's involvement in this assault upon Plaintiff was

closed, with the matter "considered resolved." *See* **Exhibit 9**, *Trani/DOC Letter to Proud*. Upon information and belief, since this assault, Defendant Proud has continued to be involved in repeated unnecessary use of force incidents on other inmates.

69. Also since this incident, Defendant Proud was permitted to continue his systematic harassment and threats against Plaintiff, exacerbating Plaintiff's trauma and suffering. In the weeks after the assault (and before Plaintiff's transfer to SCCF), Defendant Proud regularly went to Plaintiff's cell door in the middle of the night and banged on it to wake him up, yell "how's your face feeling?" and otherwise harass Plaintiff and keep him living in fear. Accompanied by Officer Duty, Defendant Proud has also continued calling Plaintiff a "monkey" and when Plaintiff has gotten upset, Defendant Proud told him "shut up boy, or I will bust your face open again." Other officers like correctional officer Jonathan Schultz have joined in on the harassment and threats, telling Plaintiff that he is "lucky [Schultz] wasn't there, or you wouldn't have woken up at all."

70. There is a custom and practice at Centennial Correctional Facility among correctional officers to assist one another in covering up excessive uses of force on inmates that are felt to "deserve" it. Defendants Trani and Ortiz are aware of this custom and practice and both facilitate and participate in it. Plaintiff is considered by correctional officers to be one of the inmates that "deserves" whatever he gets and for whom no correctional officer should get in trouble for assaulting.

71. In just one example of this unmitigated custom/practice at CCF, correctional officer Constance Crossman stated in her interview with OIG investigator Wold that Plaintiff Mr. Lovett has "caused us more problems than you know" at CCF, and that as a result, regardless of "what happened that day," she "[did] not want to see anybody get in trouble over this guy." *See* **Exhibit 2**, at 06:14.

72. Shortly after the assault, and as a result of the inadequate and delayed medical care provided by Defendants Hodge and Arthur-Cain, Plaintiff's left eye became infected. Plaintiff sent out kites and complaints declaring a medical emergency due to his eye being infected. Defendant Proud was on duty when those kites were sent out and he told Plaintiff no one cared and he would not be receiving treatment. Plaintiff continued sending out kites regarding his eye being in pain and swelling. Defendant nurse Arthur-Cain joined Defendant Proud in ignoring Plaintiff's claims, causing his eye to become more infected and swollen. Finally after two days of suffering Plaintiff was able to get medical treatment for his left eye which was by then critically infected. Plaintiff suffered permanent vision loss and associated ocular injuries as a result of Defendants' indifference to his serious medical need.

73. Dr. Joan Koprivnikar is a contract psychiatrist employed by the Department of Corrections, with Plaintiff as one of her patients. Plaintiff Mr. Lovett has been a patient of hers since 2010. Dr. Koprivnikar states that since the assault incident, as compared to her prior contact with Plaintiff, she's made the following findings and observations: that his cognitive abilities have diminished, including but not limited to

the inability to articulate himself and having difficulty with this speech and finding his words, and that his overall demeanor has changed from previously being an assertive and outgoing personality to now being more quiet, fearful, and withdrawn. Dr. Koprivnikar considers these behavioral changes to be consistent with someone who has suffered a traumatic brain injury.

74. Plaintiff has also suffered from Post Traumatic Stress Disorder (PTSD) since Defendants' attack. This diagnosis was added to Plaintiff's medical records in July 2015. Dr. Koprivnikar has observed PTSD symptoms in Plaintiff and finds them consistent with being a victim of the Defendants' assault and the resultant trauma he suffered to his face, eye and head. *See* **Exhibit 10**, *OIG Interview with Dr. Koprivnikar* ("The Mr. Lovett that I treated back in 2010 is very different from the Mr. Lovett following this incident in 2014."). The symptoms of Plaintiff's PTSD from this assault continue to re-traumatize Plaintiff. He is depressed. He has constant, regular nightmares and night terrors. He has become hypervigilant and constantly fearful and paranoid. He has become hesitant to take his medications due to being understandably unable to trust that DOC employees do not intend him to suffer further serious bodily harm.

75. After Dr. Koprivnikar recorded her observations and added the PTSD diagnosis to Plaintiff's mental health records, Defendants Trani and Wasko ordered Plaintiff removed as her patient. Plaintiff is no longer permitted to see Dr. Koprivnikar and now sees a DOC psychiatrist who, incredibly, has declared all of Plaintiff's symptoms

and suffering to be malingering and has even gone so far as to categorically pronounce Plaintiff suddenly free of mental illness. This new DOC mental health provider made such a pronouncement despite the fact that even Defendant Warden Travis Trani himself was personally familiar with Plaintiff prior to this incident as a "seriously mentally ill offender." *See* **Exhibit 7**, at 20:42. The sudden cessation of psychological care and treatment has exacerbated Plaintiff's injuries and psychological suffering.

76. Since the assault, Plaintiff has suffered severe losses in cognitive function. Plaintiff's speech has become slurred and slower. He now has frequent difficulty finding words and presents like someone who is developmentally delayed, which is very different from how he presented in the past. Plaintiff's ability to communicate, the fluency of his speech, how fluid his thought processes are, and his ability to think have all deteriorated.

77. The damage the assault caused to Plaintiff's brain, as well as the consequent Post Traumatic Stress Disorder, have exacerbated his mental health conditions. Plaintiff now suffers from hallucinations and paranoid delusions, constant nightmares and night terrors reliving the incident and being paralyzed with fear that it will happen again. Plaintiff lives in fear of being retaliated against for reporting the incident. He has since the incident at times become suicidal and engaged in acts of self-harm. Plaintiff now has regular panic attacks several times per week where he feels unable to breathe or speak. He has been unable to sleep more than 2-4 hours per night due to

the overwhelming anxiety, night terrors, discomfort and fear. He has become highly stressed, experiencing intense feelings of paranoia and suffering regular flashbacks. Plaintiff continues to suffer from psychological trauma and mental anguish including depression, panic attacks and nightmares of the assault. As a result of Defendants' deliberate indifference to Plaintiff's constitutional rights and serious medical needs, Plaintiff lives in constant (and, unfortunately, reasonable) fear that those in charge of his custody are trying to kill him.

78. The injuries to Plaintiff Mr. Lovett's head, brain and face also caused him to immediately begin suffering from painful migraine headaches and vision problems including blurriness, dizziness, double vision and constant pain in his left eye.

79. Plaintiff has filed grievances seeking relief for all of the above constitutional violations and those grievances have been ignored, destroyed, or denied. Plaintiff continues to file grievances seeking medical care and treatment for his vision loss, severe headaches, dizziness and damage to cognitive functioning. Defendant Deputy Executive Director Kellie Wasko and the Department of Corrections continue to refuse him any such treatment, stating that his medical care has been sufficient and if he wants further assessment or treatment he must first come up with the money to pay for it himself through a private provider.

80. DOC and Defendant Wasko had provided Plaintiff with x-rays and medical care at outside facilities for less serious medical needs prior to this incident without first requiring Plaintiff to pay for it. Defendant Wasko and DOC only invoke a policy

requiring Plaintiff to first pay for his medical care now because they seek to minimize discovery and documentation of the true extent of Plaintiff's injuries (and thus the monetary damages for which they will be liable) in this lawsuit.

81. As a result of the Defendants' conduct, Plaintiff Mr. Lovett has suffered, and continues to suffer, damages in an amount to be proven at trial.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*42 U.S.C. § 1983 – 8th Amendment Violation – Excessive Force, Cruel & Unusual Punishment*
(against Defendants Martinez and Proud)

82. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

83. The actions of Defendants as described herein, while acting under color of state law, intentionally deprived Mr. Lovett of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including his right to be free from excessive force and cruel and unusual punishment, as guaranteed by the Eighth Amendment to the Constitution of the United States of America.

84. Defendants Proud and Martinez planned to assault Plaintiff that day. Taking Plaintiff to the ground once he was fully restrained and helpless was the goal of their conspiracy. This is why they were smirking when they arrived to escort him, and it is why they deliberately ignored Plaintiff's "high security risk" status requiring that he be escorted by three officers including someone with a camcorder and instead attempted to transport him in secret and without anyone recording them up close. It is

31

also why Defendant Proud did not have a hand on Plaintiff while he was having leg cuffs applied (and in fact was not standing anywhere near the restrained Plaintiff to catch any possible falls), as he was trained to do for inmate safety. Defendant Proud was instead anticipating Defendant Martinez's preliminary assault and did not want to get in the way of it. Defendant Proud meanwhile made deliberate efforts (unsuccessfully) to provoke Plaintiff into saying or doing something that would permit Defendants Martinez and Proud to later justify their assault.

85. Defendants proceeded with their planned assault on Plaintiff and concordant conspiracy to violate Plaintiff's constitutional rights despite Plaintiff's refusal to engage or respond to Defendant Proud's provocation because they knew that the video camera coverage in the area where they were cuffing Plaintiff was minimal to nonexistent. They did not expect or anticipate that the videos would be able to be enhanced and thus presumed that they would be able to falsify their reports and never be held accountable. This gap in video camera coverage in the mental health intake area was a fact generally known amongst the officers at CCF.

86. The Defendants' actions in assaulting Plaintiff were not inadvertent or a good faith mistake. Their actions were deliberate and intended to cause Plaintiff to suffer pain, paralyzation, brain injury and/or death.

87. Defendant Martinez subjected Plaintiff to an unnecessary and wanton infliction of pain when he used Plaintiff's leg cuffs to rip him off his feet and slam his head into the concrete floor.

88. Defendant Proud subjected Plaintiff to an unnecessary and wanton infliction of pain when he knowingly defied his training and all common sense with regard to inmate safety and stood back from Plaintiff several feet while he was cuffed, as Proud knew Martinez would be taking Plaintiff to the ground once restrained and intended to do nothing to break or lessen the impact of Plaintiff's fall or to otherwise protect Plaintiff's head during that assault.

89. Both Defendants' actions were done maliciously and sadistically and without any provocation from Plaintiff. There was no acceptable disciplinary purpose for this assault. It was unrelated to any possible need of restoring order, as there was no disorder. Rather, Defendants Martinez and Proud assaulted Plaintiff for the sole purpose of causing Plaintiff suffering and pain.

90. Defendant Martinez and Proud's initial assault on Plaintiff was unnecessary and wanton. It utilized Plaintiff's restraints as a deadly weapon against his helpless person. Every use of force expert to review what Defendants Martinez and Proud did to Plaintiff has easily concluded the use of force was excessive, reckless, and that both of their conduct, in concert, subjected Plaintiff to an enormous risk of suffering a broken neck, spine, or death.

91. Defendant Martinez's and Proud's assault on Plaintiff was done with deliberate indifference to Plaintiff's rights as a human and Plaintiff's life itself.

92. Defendants intentionally, knowingly and maliciously assaulted Plaintiff in a manner that made severe head injury certain, and paralyzation or death quite possible. Their

conduct was so egregious as to shock the conscience. No American citizen would believe any corrections officer could or would deliberately, maliciously, and arbitrarily inflict such harm (as well as the attendant risk of exceedingly worse harm) on a fully restrained, helpless inmate in custody.

93. Compounding the outrageousness of this abuse, Defendants then falsified their reports to suggest that Plaintiff had been "placed" on the floor and that Plaintiff had kicked his foot at Defendant Martinez while being restrained. Defendants knew neither of those statements to be true but included them in their reports anyway to cover up their malicious assault on Plaintiff.

94. Defendants' falsification of their reports caused Plaintiff to be wrongly subjected to administrative sanctions.

95. Defendants' conduct and successfully executed conspiracy to violate Plaintiff's constitutional rights proximately caused significant injuries, damages, and losses to Plaintiff Mr. Lovett.

**SECOND CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – 8th Amendment Violation – Excessive Force, Cruel & Unusual Punishment*
(against Defendants Martinez and Proud)

96. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

97. The actions of Defendants as described herein, while acting under color of state law, intentionally deprived Mr. Lovett of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including his

right to be free from excessive force and cruel and unusual punishment, as guaranteed

by the Eighth Amendment to the Constitution of the United States of America.

98. Defendants Martinez and Proud's violations of Plaintiff's constitutional rights were

not limited to the initial taking out of Plaintiff while he was helpless and restrained.

Following their initial assault, Defendants Martinez and Proud deliberately caused

further needless infliction of pain on Plaintiff by jumping onto Plaintiff's unconscious

and bleeding body, kneeing Plaintiff in the back, spine, and neck, and applying pain-

inducing pressure maneuvers to his neck. When Plaintiff began to regain

consciousness and tried to lift his head out of the pool of his own blood swelling

around it, Defendants pushed Plaintiff's face back down directly into the pool of

blood causing him further pain, suffering, and psychological trauma.

99. Defendant Martinez's and Proud's assaults on Plaintiff's person while Plaintiff was

on the floor were unnecessary and wanton. At all times Plaintiff was restrained, and at

all times Plaintiff was unconscious, barely conscious, or seemingly conscious but

fully compliant and yet Defendants Martinez and Proud elected to continue harming

Plaintiff and inflicting pain on him.

100.   Defendants Martinez and Proud utilized PPCTs to inflict pain on Plaintiff in front

of other officers because they were trained and familiar with the custom at CCF of it

being acceptable to use PPCTs on offenders solely for purposes of punishment.

101.   Defendant Martinez and Proud's continued assaults upon Plaintiff, causing him to

suffer more pain for no disciplinary purpose, obstructed the First Responders' ability

to provide Plaintiff with medical care immediately following the assaults. Plaintiff began to regain consciousness during Defendants' secondary assaults and is plainly seen on the video suffering immense pain and psychological trauma as a result of their continued attack on his defenseless person.

102.    Defendant Martinez's and Proud's secondary assaults upon Plaintiff were done with deliberate indifference to Plaintiff's rights as a human and Plaintiff's life itself.

103.    Defendants' conduct and successfully executed conspiracy to violate Plaintiff's constitutional rights proximately caused further significant injuries, damages, and losses to Plaintiff Mr. Lovett. Of note, Defendants' secondary assaults upon Plaintiff's helpless, bleeding and injured person profoundly exacerbated the psychological trauma suffered by Plaintiff as a result of the entire event.

**THIRD CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – 8th Amendment Violation –Failure to Train, Failure to Supervise, Failure to Investigate, Policies/Customs/Practices Causing Violation*
(against Defendants Trani and Ortiz)

104.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

105.    At all times relevant to the allegations in this Complaint, Defendants Trani and Ortiz acted or failed to act under color of state law.

106.    The actions of Defendants as described herein, while acting under color of state law, intentionally deprived Mr. Lovett of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including his right to be free from excessive force and cruel and unusual punishment,

as guaranteed by the Eighth Amendment to the Constitution of the United States of America.

107.   Defendant Warden Trani and Defendant Captain Ortiz had duties to train and supervise correctional officers and medical staff to ensure the safety and well-being of prisoners such as Plaintiff Mr. Lovett confined at Centennial Correctional Facility.

108.   Defendants Trani and Ortiz failed to discharge this duty in several respects which both caused the constitutional violations experienced by Plaintiff and exacerbated the extent of the physical and psychological injuries he suffered therefrom.

109.   Defendant Trani and Ortiz acted intentionally in failing to adequately train and supervise correctional officers and medical staff, particularly with regard to the repeated physical attacks upon, and failure thereafter to provide critical medical care for, Plaintiff. Defendant Trani and Ortiz's conduct was motivated by a reckless and callous indifference to the federally protected rights of inmates in their custody.

### Use of PPCT Maneuvers

110.   Pressure Point Control Tactics ("PPCT") are a method utilized by DOC employees to subdue combative or aggressive inmates. PPCTs are maneuvers that rely on the infliction of terrible pain at one or more nerve points in the body to "stun" or otherwise force a resistant or combative inmate to become compliant. By official DOC policy, these maneuvers are not to be used as punishment and may only be employed when reasonably necessary to gain control of an aggressive and uncontrolled offender.

111.   Defendant Trani was responsible for the creation of customs, policies and practices at CCF regarding when it is appropriate to use PPCTs on inmates, and providing correctional officers with appropriate training thereon. Defendant Ortiz was also responsible for the implementation and supervision of the use of those customs, policies and practices at CCF.

112.   Defendant Trani implemented training and policies that led correctional officers such as Defendants Martinez and Proud, as well as subsequent correctional officers who can be seen on video also climbing on top of Plaintiff while he is bleeding on the ground, to believe it permissible to inflict pain and pressure point control maneuvers on a fully restrained, compliant inmate such as Plaintiff.

113.   By official DOC policy, PPCT maneuvers are not to be used on compliant inmates. By official DOC policy, PPCT maneuvers are not to be used solely for purposes of inflicting pain. Both Defendant Martinez and Defendant Proud, as well as another correctional officer at CCF, utilized PPCTs on the compliant and fully restrained Plaintiff solely for the purpose of causing him pain. They did in fact cause him tremendous and substantial additional pain, and he can be observed on one of the videos, *see* **Exhibit 5**, crying out in response to the infliction of this needless pain. This was cruel and unusual punishment in violation of the 8th Amendment. When these three correctional officers committed these constitutional violations on Plaintiff, no bystander officer stopped them or attempted to intervene. This was because the use

of PPCTs solely to inflict pain on disliked, compliant inmates at CCF was common policy and practice.

114.    Solely by virtue of Defendants Trani and Ortiz's promulgation of this policy and practice, and their failure to properly train or supervise thereon, nearly all the staff at CCF – Defendants Trani and Ortiz included – were deliberately indifferent to the inmates' constitutional right to not be subjected to needless pain and excessive uses of force as well as the substantial risk that such deliberate indifference would in fact cause regular constitutional violations (like those observed on the videos in this case) involving the infliction of needless pain and excessive uses of force.

115.    This custom and the training provided (or not provided) thereon by Defendants Trani and Ortiz was thus naturally a driving force behind the additional needless pain and suffering Plaintiff was forced to endure after Defendant Martinez's and Proud's initial assault upon him.

### *Failure to Properly Train – Use of Restraints to "Take Down" an Inmate*

116.    Defendants Trani and Ortiz provide training regarding the use of force to correctional officers at CCF. Upon information and belief, that training suggests that the aggressive and life-threatening manner in which Defendant Martinez and Proud took Plaintiff to the ground on September 10, 2014 can be permissible and that, rather than being banned outright as categorically inappropriate and highly likely to kill an inmate, officers are trained that the use of such a maneuver is instead subject to a

"totality of the circumstances" type of assessment rendering it okay in certain situations at the discretion of the officer.

117.   Defendant Martinez stated in an interview with OIG Investigator Wold that DOC trains its officers to get offenders deemed to be non-compliant "to the ground as fast as we can." *See* **Exhibit 6**, *OIG Interview with Martinez*, at 14:05. Defendant Martinez stated that his and Proud's takedown of Plaintiff was consistent with his training. *Id.*

118.   Anthony Ayala, a correctional officer at Centennial Correctional Facility stated in an interview with OIG Investigator Wold that DOC trained them that you can use the restraints on a restrained inmate to take them down "as the situation dictates it." *See* **Exhibit 11**, *OIG Interview with Ayala*, at 07:56.

119.   Rebecca Duty, a correctional officer at Centennial Correctional Facility stated in an interview with OIG Investigator Wold that based on her DOC training, "it's hard" to say whether dumping a restrained inmate on his head using his restraints is proper procedure, and that when she worked at CSP, "it's happened before." *See* **Exhibit 12**, *OIG Interview with Rebecca Duty*, at 6:35.

120.   There is no question that even if Plaintiff *had* kicked Defendant Martinez, flipping him onto his head while fully restrained was still a plain and obvious assault and violation of Plaintiff's federally protected rights. However, revealing the understanding and custom at CCF which suggested that if there *had* been some kind of kick, Defendant Martinez and Proud's assault would have been justified,

Lieutenant Traci Miramontes, a correctional officer at Centennial Correctional Facility stated in her interview with OIG Investigator Wold that she desperately had every possible camera angle in the facility area pulled when investigating the incident "hopefully trying to see that kick," **Exhibit 8** at 11:05.

121.   Defendants Trani and Ortiz were untruthful when asked about these realities by OIG Investigator Wold.

122.   This sort of training provided by Defendants Ortiz and Trani (and possibly the DOC itself) was also a moving force behind, and foreseeable cause of, the constitutional violations and injuries suffered by Plaintiff.

*Failure to Supervise and Investigate Employees' Known Patterns of Escalating Threats and Harassment Against Plaintiff*

123.   Defendants Trani and Ortiz were each personally aware that Defendant Proud had, with other correctional officers (including but not limited to, Kevin Duty and Jonathan Schultz), been threatening, taunting, and racially harassing Plaintiff in the months leading up to Defendant Martinez's and Proud's assault.

124.   Defendants Trani and Ortiz were also each personally aware that Defendant Martinez had a reputation for being a "snap cap" officer quick to anger and disturbingly eager to initiate and participate in uses of force against inmates. Despite this knowledge, Defendants Trani and Ortiz tasked Defendants Proud and Martinez with the unmonitored escort of Plaintiff Lovett, an inmate with serious mental illness, in an area known within the facility among officers to have limited video camera

coverage, and Defendants did this with deliberate indifference to Plaintiff's constitutional rights, and reckless disregard for the harm that would likely result to Plaintiff if not protected from these two unstable, aggressive and retaliatory correctional officers.

125.   Had Defendants Trani and Ortiz properly executed their duties to supervise their employees and investigate both known complaints of escalating threats/harassment by those employees and known patterns indicating a dangerous proclivity for uses of force by those employees, the attacks on Plaintiff never would have happened.

126.   Plaintiff made repeated claims and filed numerous grievances informing Defendants Trani and Ortiz of Defendant Proud's repeatedly stated intent to harm Plaintiff, and of Defendant Proud's continued racial harassment and verbal antagonism of Plaintiff. Other inmates not Plaintiff also filed grievances alerting Defendants Trani and Ortiz to the same. Plaintiff's family members, including his mother, contacted Defendant Trani to complain and alert him to Defendant Proud's (and others') escalating antagonism and threats against Plaintiff. Defendant Trani and Ortiz knowingly and willfully ignored all of these indicators of impending harm to Plaintiff, failed to investigate, and failed to supervise correctional officers such as Proud and Martinez and did so knowing that this would subject inmates and Plaintiff specifically to a substantial risk of real harm from those officers.

127.   Defendants Trani and Ortiz's long-standing failure to properly train and supervise their subordinates, as well as their refusal to investigate such claims against such

employees, created an atmosphere at CCF wherein their subordinates correctly believed they could antagonize, racially harass, and physically assault weak and mentally ill inmates like Plaintiff without risking their employment or suffering any consequences whatsoever.

128.    In fact, Defendant Ortiz personally attempted to assist Defendants Proud and Martinez in their efforts to commit such constitutional violations against Plaintiff without consequence by issuing his own written report regarding Defendants Proud and Martinez's assaults on Plaintiff wherein he falsely confirmed that Plaintiff had kicked Defendant Martinez and further falsely averred that Plaintiff had been aggressive towards Defendants Proud and Martinez while restrained on the ground bleeding all over the cement floor thereafter.

129.    Defendant Trani also personally assisted and further cemented the understanding at CCF that inmates such as Plaintiff (those that are weak, mentally ill, small in stature, African-American, and/or with a previous history of management or compliance issues) could be both racially harassed and physically abused without any consequence by administratively exonerating Defendant Proud of any liability or consequence for his attack and pattern of harassment upon Plaintiff. *See* **Exhibit 9,** *Trani Letter to Proud.* Defendant Trani successfully fought to keep Defendant Proud employed at CCF despite the fact that he is criminally charged with felony offenses related to his attack upon Plaintiff and his subsequent cover-up of that attack. Defendant Trani did this pursuant to the well-known custom and understanding he

43

and Defendant Ortiz deliberately perpetuated amongst employees at CCF that their perpetual verbal abuse, racial harassment, and targeting of mentally ill (and therefore less credible) inmates for physical abuse was acceptable so long as the inmate "deserved" it, and (more importantly) so long as it was done less obviously than Defendant Martinez.

130.   Correctional officer Constance Crossman confirmed this custom promulgated by Defendants Ortiz and Trani in her interview with OIG Wold, when she stated: "I don't really know a lot about what happened that day, but what I do know is, is I know how Lovett is, and he's not an angel by any means, and I don't want to see anybody get in trouble over this guy." *See* **Exhibit 2** at 06:14.

131.   Defendant Trani and Ortiz's creation and maintenance of this atmosphere at CCF and their refusal to intervene to stop or otherwise punish such practices was the result of their deliberate indifference to the constitutional rights of inmates such as Plaintiff and was a driving force behind the assaults committed upon (as well as the knowingly inadequate medical care provided thereafter to) Plaintiff.

132.   Defendant Trani created and maintained this understanding amongst those employed in the medical department of CCF as well. Defendant Trani and his refusal to intervene or punish such practices at CCF caused Defendant Hodge and Arthur-Cain to correctly believe that they could and should deny Plaintiff critical medical care (such as hospitalization outside the facility, tests, scans, and immediate necessary treatment) following Defendant Proud and Martinez's assaults, to assist in covering

up those assaults and in minimizing the documented scope of any injuries resulting therefrom.

133.    Indeed, Defendant Trani was personally aware of the injuries sustained by Plaintiff and his serious medical need for treatment and outside medical care. However, upon seeing the video, Defendant Trani became keenly aware that a civil lawsuit seeking monetary damages would be forthcoming. In an effort to shield the DOC, himself and Defendant Proud from such liability, and to conceal the fact that it was the policies, practices and customs he had personally promulgated, his failure to train and supervise his employees, and his refusal to investigate the dangerous circumstances that had led to such assaults and liability, Defendant Trani knowingly and with deliberate indifference to Plaintiff's health and serious medical needs personally endorsed Defendant Hodge's refusal to provide Plaintiff with the critical medical care and treatment he required, exacerbating his injuries.

### Use of Spit Masks and Universal Restraints to Punish

134.    Defendants Trani and Ortiz also knowingly and regularly authorized and permitted their subordinates to put spit masks and universal restraints on inmates for punishment rather than any proper purpose related to maintaining order. This was despite the fact that DOC official policy prohibited the use of spit masks or universal restraints on inmates who were not dangerous, disruptive or self-injurious. Defendants Trani and Ortiz encouraged their subordinates to ignore these critical limits on the use of such measures. Both Defendant Trani and Defendant Ortiz promulgated, created and

possessed responsibility for the continued operation of the CCF employees' policy/practice of putting spit masks over the face of and universal restraints on inmates that they did not like solely for reasons of inflicting pain and punishment.

135.    Plaintiff had not spit at anyone on September 10, 2014. He had not engaged in one single act of physical noncompliance. Yet after the initial assaults by staff upon him, and due to Defendant Trani's and Ortiz's promulgation of the use of spit masks and universal restraints on disliked offenders, a spit mask was placed over his bleeding and swelling face and he was put into universal restraints, unable to move for hours. Not one single employee at CCF objected to this procedure or intervened to stop it; including Defendants Trani and Ortiz, who were both personally aware that these actions had been taken. Plaintiff's additional suffering, trauma and pain following Defendant Martinez's and Proud's assaults – as well as the permanent vision loss suffered from blood welling up into his left eye for several hours – were the result of this policy and practice permitted and promulgated by Defendants Trani and Ortiz.

136.    Defendants Trani and Ortiz's promulgation of this practice demonstrated their deliberate indifference to a substantial risk of harm – both physical and psychological – to compliant (and physically injured) inmates such as Plaintiff and did in fact cause Plaintiff to suffer further and additional injuries and psychological trauma.

**FOURTH CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – Violation of Eighth Amendment – Deliberate Indifference to*
*Serious Medical Need*
(against Defendant Hodge)

137.   Plaintiff incorporates all other paragraphs of this Complaint for purposes of this

claim.

138.   At all times relevant to the allegations in this Complaint, Defendant Dr. Hodge

acted or failed to act under color of state law.

139.   At all times relevant to the allegations in this Complaint, Defendant Hodge knew

of Mr. Lovett's life-threatening head injury, the fact that Plaintiff had most certainly

sustained (at a minimum) a severe concussion and traumatic brain injury and that

follow-up testing to assess and treat the damage, swelling, and bleeding in Mr.

Lovett's brain and around his eye was basic medical treatment Plaintiff required.

140.   Nevertheless, and with deliberate indifference to Mr. Lovett's constitutional right

to receive necessary medical care, protected under the Eighth Amendment to the U.S.

Constitution, Defendant Hodge failed to examine, treat, and care for Mr. Lovett's

severe head injury and failed to send him for treatment which would have included, at

a minimum, X-rays, a CT scan, and a brain MRI. Defendant Dr. Hodge did so despite

his knowledge of Mr. Lovett's serious medical needs, placing Plaintiff at risk of

substantial additional physical harm as well as at risk of serious brain injury or death.

Defendant Dr. Hodge's deliberate indifference to these serious medical needs did in

fact cause Plaintiff to suffer additional and exacerbated brain injuries, loss of

cognitive functioning, and vision loss in his left eye.

141.   Defendant Dr. Hodge was the provider at CCF charged with the provision of Plaintiff's medical care and treatment and the authority to have Plaintiff sent to a hospital for necessary imaging, testing and treatment for his injuries. Defendant Dr. Hodge knew that if he elected not to authorize this basic medical care for Plaintiff, no one else would know or have the ability to provide it in a timely manner. Despite this knowledge, and because he both disliked Plaintiff and felt that Plaintiff deserved to suffer, Defendant Dr. Hodge prevented Plaintiff access to this critical medical care.

142.   Also because he both disliked Plaintiff, Defendant Dr. Hodge denied Plaintiff any analgesics or pain relief for his multiple swelling head contusions. Defendant Dr. Hodge knew that Plaintiff was plainly in serious medical need of treatment for his obvious and observable pain and suffering and rather than giving him any kind of pain medication or other anesthetic treatment to reduce Plaintiff's suffering, he denied him access to the same and instead gave Plaintiff an ice pack that he knew Plaintiff, by virtue of his universal restraints, would be unable to even apply to his own head.

143.   Defendant Dr. Hodge examined Plaintiff's wounds, saw the obvious need for x-rays and scans to assess and prevent exacerbation of those injuries, acknowledged that obvious need inwardly, and then told medical staff to not provide Plaintiff with access to that care or any pain medication.

144.   Defendant Dr. Hodge left Plaintiff bleeding into a spit mask for three hours before providing any medical care or treatment at all, causing further pain, suffering, and psychological trauma. Upon information and belief, this deliberate indifference on the

part of Defendant Dr. Hodge, and his knowing indifference to the welling up and stagnation of blood in that eye, was a primary cause of the subsequent infection to Plaintiff's left eye and exacerbated the permanent vision loss suffered by Plaintiff in that eye.

145.   Any doctor of any field of practice knows that when a person sustains a head injury serious enough to cause loss of consciousness on impact, that person must be evaluated by a neurologist or other doctor with specialty in brain trauma immediately to ensure that there is not bleeding or clots forming in the brain as a result of the impact, and to make other time-sensitive, critical medical assessments. Defendant Dr. Hodge did not like Plaintiff and assumed that Plaintiff's injury was his own fault, and allowed those emotions to supersede such medical common sense, despite being told by First Responders and Plaintiff himself that the impact of his head injury caused Plaintiff to lose consciousness. Dr. Hodge by his actions prevented Plaintiff from getting the critical medical care he needed and as a result, Plaintiff's cognitive, brain, vision and psychological injuries were exacerbated. Dr. Hodge by his actions also caused Plaintiff to experience additional needless pain and suffering.

146.   Defendant Dr. Hodge subsequently became aware of the fact that Plaintiff did not provoke or otherwise do anything to justify Defendant Martinez's and Proud's assaults upon him. Defendant Dr. Hodge also subsequently became aware that Defendant Martinez's and Proud's assaults on Defendant were inevitably going to provide Plaintiff with grounds for a civil lawsuit and damages. This did not change

Dr. Hodge's deliberately indifferent attitude towards Plaintiff's serious medical need for testing and treatment. To the contrary, Defendant Dr. Hodge instead attempted to cover up the evidence of his deliberate indifference to Plaintiff's serious medical needs by, among other actions, directing his medical staff to disregard and destroy any subsequent kites or complaints of medical emergency from Plaintiff and to generally ignore his medical needs to the maximum extent possible. Defendant Dr. Hodge did this with the objective of minimizing any and all medical records that might be generated by such testing and treatment so as to conceal the true extent of Plaintiff's injuries and, more importantly to Dr. Hodge, to conceal the true extent to which his own deliberate indifference to Plaintiff's medical needs immediately following the assaults exacerbated those injuries.

147.    Defendant Dr. Hodge's actions cause Plaintiff to still be in pain and still be suffering from complications of his untreated head/brain injury today. Knowledge of the fact that Defendant Dr. Hodge and his staff in CCF's medical unit were seemingly complicit in, or accessories after the fact to, Defendant Martinez's and Proud's assaults upon him has caused Plaintiff to suffer nightmares, constant fear and anxiety, and paranoia and stress arising from the (understandable, and plainly well-founded) fear that literally all those charged with his care intend to either kill him or allow him to suffer permanent disfigurement/brain damage by denying him critical medical treatment.

148. Defendant Hodge's acts and omissions were conducted within the scope of his official duties and employment at the Department of Corrections.

149. Defendant Hodge's conduct proximately caused further significant injuries, damages, psychological trauma, pain, suffering and losses to Mr. Lovett.

**FIFTH CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – Violation of Eighth Amendment – Deliberate Indifference to Serious Medical Need*
(against Defendant Arthur-Cain)

150. Plaintiff incorporates all other paragraphs of this Complaint for purposes of this claim.

151. At all times relevant to the allegations in this Complaint, Defendant Arthur-Cain acted or failed to act under color of state law.

152. Defendant Arthur-Cain claimed that she injured her knee responding to provide medical care to Plaintiff following Defendant Martinez's and Proud's assaults upon him. She held this against Plaintiff personally and it led her to falsify and minimize information regarding Plaintiff's injuries and pain level in completing his initial medical intake.

153. Defendant Arthur-Cain delayed the provision of medical care to Plaintiff while she pursued medical care for her own injury first. Defendant Arthur-Cain knew that she should have asked or directed another medical professional to complete Plaintiff's medical intake and begin the provision of medical care, and instead kept Plaintiff waiting for herself, as she intended to take out her anger towards Plaintiff for her knee injury by minimizing the documentation of his injuries, pain, and suffering and

falsifying time information on those reports regarding when she evaluated him much later.

154.   Defendant Arthur-Cain directed and permitted that Plaintiff remain fully restrained and in a spit mask while she delayed his receipt of critical medical care. She did this with deliberate indifference to Plaintiff's serious medical needs and with the actual subjective purpose of causing him to experience more pain and suffering than he would have otherwise with timely and appropriate medical care.

155.   Defendant Arthur-Cain in concert with Defendant Dr. Hodge left Plaintiff with blood welling up into and inside of his left eye on account of his injuries and the spit mask put over his face thereafter for over three hours. This caused Plaintiff additional needless pain and suffering and was the driving force behind the subsequent infection and permanent vision loss and pain now experienced in Plaintiff's left eye.

156.   Timely receipt of necessary medical treatment would have minimized or prevented this substantial harm.

157.   Defendant Arthur-Cain in concert with Defendant Dr. Hodge also left Plaintiff without analgesics or pain relievers for over three hours, exacerbating profoundly his pain and suffering from Defendant Martinez's and Proud's assaults. To ensure that Plaintiff suffered as much as possible, and to reduce the likelihood of Plaintiff receiving analgesics or any other appropriate medication for pain relief from any one else, Defendant Arthur-Cain falsified information on Plaintiff's medical intake form,

marking (rather ridiculously) that Plaintiff's pain level from the assaults and his multiple bleeding head wounds was a "zero" on a scale from 0-10.

158.   Plaintiff's needs for such pain relief, medical care and treatment were objectively serious and obvious, and Defendant Arthur-Cain, out of her anger towards Plaintiff (blaming him for her knee injury), deliberately inflicted these harms upon Plaintiff with knowing and willful indifference to both his medical needs and the substantial risk of infection and permanent injuries that such indifference would likely (and did) cause.

159.   Defendant Arthur-Cain's acts and omissions were committed within the scope of her official duties and employment at the Department of Corrections.

160.   Defendant Arthur-Cain's conduct proximately caused further significant injuries, damages, psychological trauma, pain, suffering and losses to Mr. Lovett.

**SIXTH CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – Violation of Eighth Amendment – Deliberate Indifference to Serious Medical Need*
(against Defendant Wasko)

161.   Plaintiff incorporates all other paragraphs of this Complaint for purposes of this claim.

162.   At all times relevant to the allegations in this Complaint, Defendant Wasko acted or failed to act under color of state law.

163.   Upon information and belief, in her capacity as Deputy Executive Director, Defendant Kellie Wasko has the authority and ability to authorize medical care and treatment for inmates in the custody of DOC.

164.   Plaintiff has a serious ongoing medical need for treatment of his cognitive, head, brain and eye injuries sustained as a result of the constitutional violations inflicted upon him while in custody as CCF. He is demonstrating all symptoms of an untreated traumatic brain injury, including but not limited to: depression, dizziness, headaches, pain, discomfort, loss of vision, loss of speech, mental difficulties and memory loss. He requires treatment and extensive rehabilitation. He has made repeated requests for such treatment and been denied.

165.   DOC has informed Plaintiff that if he wants testing or treatment for his traumatic brain injury and vision loss, he must first deposit sufficient funds to pay for it pursuant to Administrative Regulation 700-21 (AR 700-21). Plaintiff is indigent. This policy, officially authorized by Defendant Wasko and now directed at Plaintiff, demonstrates a deliberate indifference to his serious medical need.

166.   Plaintiff has, while at CCF, received medical care and x-rays from providers outside DOC previously (before September 10, 2014) for gastrointestinal and other far less serious medical issues. DOC did not invoke AR 700-21 to deny Plaintiff x-rays or other medical care required from outside providers when his medical needs were not plainly caused by the assaults and other deliberate actions of DOC employees. Because Plaintiff's current medical needs are the sole and unquestionable result of constitutional violations committed by DOC employees subject to monetary recompense under 42 U.S.C. § 1983, however, Defendant Wasko and her subordinates at DOC are now invoking this policy to violate Plaintiff's federally

protected rights and prevent him from obtaining further proof and documentation of the true extent of his brain and ocular injuries.

167.   Plaintiff has exhausted all administrative avenues for obtaining such treatment. His requests for medical treatment are reasonable, and yet the Department of Corrections and Defendant Wasko, through her subordinates,[1] continue to deny those reasonable requests for medical treatment because they do not want the full extent of the injuries they and their employees inflicted upon Plaintiff to be known. Their refusal to provide Plaintiff with this critical medical treatment is causing him further pain and suffering, further psychological trauma, and it is subjecting him to a substantial and immediate irreparable risk of additional injury.

168.   There remains no other adequate remedy at law available to Plaintiff to obtain necessary medical treatment for his injuries.

169.   Plaintiff requires x-rays, a CT scan, and a brain MRI with diffusion tensor imaging to assess the extent of the damage to his brain and head and to ensure that immediate surgery is not required to resolve any subdermal hematomas that may have resulted from Defendant Martinez's and Proud's attacks followed by Defendant Hodge's and Arthur-Cain's purposely inadequate medical treatment. He needs to be seen by a

---

[1] Upon information and belief, Defendant Wasko is personally aware of Plaintiff's serious medical need and is both directing and authorizing her subordinates within DOC to refuse him the medical care and treatment he needs. To any extent that Defendant Wasko is not personally involved in the decision to deny Plaintiff with medical care for his ongoing serious medical needs, she has nevertheless authorized her subordinates to continue violating Plaintiff's constitutional right to necessary medical care by official policy and practice.

neurologist. Plaintiff also requires ocular therapy and treatment to address the ongoing permanent discomfort and loss of vision in his left eye. Plaintiff's headaches, dizziness, cognitive difficulties, memory loss, and depression resulting from the assaults require cognitive therapy to treat and alleviate his ongoing suffering. He needs to be seen and treated by a neuropsychologist. DOC categorically refuses to provide all this treatment or testing, with obvious and intentional indifference to Plaintiff's life and federally protected rights.

170.   Plaintiff continues to suffer substantial and irreparable injury each day that goes by while DOC and Defendant Wasko continue to deny him access to critical medical care and treatment. Without this treatment, his cognitive difficulties, pain and suffering are expected to worsen and his general state of health will continue to degenerate. He is at risk of developing seizures and permanent blindness in his left eye.

171.   This Court's immediate intervention in the form of an injunctive order directed at Defendant Wasko in her capacity as Deputy Executive Director of Clinical and Correctional Services for the Colorado Department of Corrections, is required. Defendant Wasko has executive oversight of all functions and departments reporting to the clinical services division of DOC, and Defendant Wasko oversees the delivery of medical and mental health services to Colorado prisoners. Because Defendant Wasko and the DOC refuse to provide Plaintiff with the medical care and treatment he requires to preserve his life and to begin efforts to cease the progress of and

rehabilitate his serious injuries, in violation of his rights under the 8th Amendment, they must be ordered to do so.

## VII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mr. Lovett respectfully requests that this Court enter judgment in his favor and against the Defendants and grant:

a.  Immediate injunctive relief authorizing the critical medical testing and treatment that Plaintiff's ongoing serious medical needs plainly require;

b.  Appropriate declaratory relief;

c.  Compensatory and consequential damages, including damages for physical harm, physical injuries, brain damage, psychological trauma, loss of vision, emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

d.  Monetary damages for all economic and noneconomic losses on all claims as allowed by law in an amount to be determined at trial;

e.  Punitive damages on all claims allowed by law and in an amount to be determined at trial;

f.  Attorneys' fees and costs associated with this action on all claims allowed by law;

g.  Pre- and post-judgment interest at the lawful rates; and

h.  Any further relief that this Court deems just and proper, and any other relief as allowed by law.

## VII. REQUEST FOR TRIAL BY JURY

Plaintiff requests a trial to a jury on all issues so triable.

Respectfully submitted this 22nd day of May, 2016.

THE LIFE & LIBERTY LAW OFFICE

*/s/ Sarah Schielke*
Sarah Schielke
Counsel for Plaintiff
The Life & Liberty Law Office LLC
509 N. Cleveland Avenue
Loveland, CO 80537
P: (970) 493-1980
F: (970) 797-4008
E: sarah@lifeandlibertylaw.com

## CERTIFICATE OF SERVICE

This is to certify that on May 22, 2016, a true and accurate copy of the foregoing *Amended Complaint and Jury Demand* as well as a CD containing copies of all audio and video exhibits attached and incorporated thereto have been sent to the following parties by the methods indicated:

William A. Rogers, III
Gabriella Stockmayer
*Attorneys for Defendant Martinez*
**Amended Complaint served via PACER/ECF**
**Exhibits Disc served via U.S. Mail and sent to**:
Dietze & Davis, P.C.
2060 Broadway, Suite 400
Boulder, CO 80302

Andrew Ringel
Edmund Kennedy
*Attorneys for Defendant Proud*
**Amended Complaint served via PACER/ECF**
**Exhibits Disc served via U.S. Mail and sent to**:
Hall & Evans, LLC
1001 17th Street, Suite 300
Denver, CO 80202

John A. VanLandschoot
*Attorney for Defendant Hodge*
**Amended Complaint served via PACER/ECF**
**Exhibits Disc served via U.S. Mail and sent to**:
Colorado Attorney General's Office
Civil Litigation & Employment Section
1300 Broadway, 10th Floor
Denver, CO 80203                         */s/ Sarah Schielke*

**Newly named Defendants Trani, Ortiz, Arthur-Cain and Wasko will be served pursuant to Fed. R. Civ. P. 4.